# EXHIBIT 1

**CITATION**

<div align="right">Paper #**1**<br>ATTY</div>

THE STATE OF TEXAS

Cause No: 2015-1169-4

TO:   TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC, A DELAWARE LIMITED LIABILITY COMPANY, DEFENDANT - BY SERVING THROUGH ITS CHAIRMAN OF THE BOARD, PETER ENGLEHART

GREETINGS:

**YOU ARE HEREBY COMMANDED** to appear before the Honorable District Court below, of McLennan County, Texas, at the Courthouse of said County located at 501 Washington Avenue in Waco, Texas, by filing a written answer with the Clerk of the Court, at or before 10 o'clock A.M. of the Monday next after the expiration of twenty days after the date of service of this citation, to the pleading described below, and you are hereby served with a copy of Plaintiff's Discovery described below, to which you must file a written answer as required by law in the cause number described below on the docket of said court, and styled,

PARTIES TO THIS ACTION ARE:

**SCSW, LLC, A DELAWARE LIMITED LIABILITY COMPANY**                                        Plaintiff

VS.

**TEN: THE ENTHUSIAST NETWORK MAGAZINES, LLC, A DELAWARE LIMITED LIABILITY COMPANY & SOURCE INTERLINK MAGAZINES, LLC, A DELAWARE LIMITED LIABILITY COMPANY**                                        Defendants

Court:  **170TH JUDICIAL DISTRICT**
Pleading: **PLAINTIFF'S ORIGINAL PETITION**
Pleading File Date: **MARCH 27, 2015**
Discovery Requests: **REQUEST FOR DISCLOSURE, PRODUCTION & ADMISSIONS**
Cause No: **2015-1169-4**

<div align="center">*NOTICE*</div>

*You have been sued. You may employ an attorney. If you or your attorney does not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and the above pleading and discovery, a default judgment may be taken against you.*

The officer executing this citation shall promptly serve the same according to requirements of law, and the mandates hereof, and make due return as the law directs.

**ISSUED AND GIVEN UNDER MY HAND AND SEAL OF OFFICE**, at Waco, McLennan County, Texas.
Issue Date: **MARCH 30, 2015.**

**CHRISTIAN J. HACK**
**510 N. VALLEY MILLS DR., #500**
**WACO, TEXAS 76710**
Attorney for Plaintiff

Jon R. Gimble, District Clerk
P.O. Box 2451
Waco, McLennan County, Texas 76703
By: _____, Deputy
                ROBERTA JEWELL

**RETURN OF SERVICE**

Style:  SCSW, LLC, A DELAWARE LIMITED LIABILITY COMPANY VS. TEN: THE ENTHUSIAST NETWORK
MAGAZINES, LLC, A DELAWARE LIMITED LIABILITY COMPANY & SOURCE INTERLINK MAGAZINES, LLC, A
DELAWARE LIMITED LIABILITY COMPANY
Cause No.:  2015-1169-4
Court:  170TH JUDICIAL DISTRICT
Paper#:  1
Instrument(s) Served:  Pleading, **PLAINTIFF'S ORIGINAL PETITION**, and Discovery, **REQUEST FOR DISCLOSURE,
PRODUCTION & ADMISSIONS**

Came to hand on the ___30___ day of ___MARCH___, 20 _15_ at _3:00_ o'clock ___P___ M. and executed on the ___2___ day

of ___APRIL___, 20 _15_ by delivering to the party designated in the citation, to-wit:
___PETER ENGLEHART - VIA CERTIFIED MAIL RRR___

at ___3:06___ o'clock ___P___ M; in person, a true copy of this citation with a true and correct copy of the pleading and

discovery attached thereto, having first endorsed on such copy of said citation the date of delivery.

FEES:  Serving one (1) copy

Total $ ___65.00___                                                                                    _____ County, Texas

NO SHERIFF OR CONSTABLE
FEES COLLECTED

By ___R. Baggeley - AUTH RULE 103___

**NOT EXECUTED FOR THE FOLLOWING REASONS** _____

and having attempted on _____.

"My name is _____ (First) _____ (Middle) _____ (Last), my

date of birth is _____, and my address is _____

_____.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in _____ County, State

of Texas, on the _____ day of _____ (Month) _____ (Year)

_____ (Signature) Declarant"

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

 **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

 **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

FILED **Roberta Jewell**
MCLENNAN COUNTY
3/27/2015 4:50:09 PM
JON R. GIMBLE
DISTRICT CLERK

CAUSE NO. **2015-1169-4**

| | | |
|---|---|---|
| SCSW, LLC, | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| V. | § | MCLENNAN COUNTY, TEXAS |
| | § | |
| TEN: THE ENTHUSIAST | § | |
| NETWORK MAGAZINES, LLC | § | |
| and SOURCE INTERLINK | § | |
| MAGAZINES, LLC, | § | |
| Defendants. | § | **170TH** JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION

SCSW, LLC, Plaintiff, files this Original Petition and Request for Declaratory Relief complaining of TEN: The Enthusiast Network Magazines, LLC, ("TEN") and Source Interlink Magazines, LLC ("Source Interlink") (or collectively as "Defendants"), and would show the Court:

### DISCOVERY LEVEL

1.    Plaintiff intends to conduct discovery in this lawsuit under Level III of the Texas Rule of Civil Procedure 190.

### THE PARTIES

2.    Plaintiff, SCSW, LLC, is a Delaware limited liability company duly registered to do business in Texas, with its principal office located in Waco, McLennan County, Texas.

3.    Defendant, TEN, is a Delaware limited liability company may be served with process through its Chairman of the Board, Peter Englehart, an individual who resides in Texas and conducts business in Texas on TEN's behalf in Texas, and may be served with process at 379 Quinn Drive, Dripping Springs, Texas 78620.

4.    Defendant, Source Interlink, is a Delaware limited liability company, duly registered to do business in Texas, which may be served with process through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper in Texas, because Defendants conduct, and have conducted business in the State of Texas.  Additionally, the acts, at least in part, giving rise to the claims asserted by Plaintiff occurred/were committed by Defendants in the State of Texas.

6.     Venue is proper in McLennan County, Texas because it is the location where Plaintiff maintains its principal Texas office.

## FACTS

7.     Plaintiff is a Delaware limited liability company whose membership is comprised of numerous independent race tracks located throughout the United States.  Plaintiff was formed for the purpose of purchasing a racing event known as "Super Chevy Show."  Each member of Plaintiff is, and was, familiar with the Super Chevy Show events that had been operated for years by Auto Star Production, Inc. ("Auto Star"), and its sole shareholder  Roger A. Gustin ("Gustin") at various locations across the country, including events held in the State of Texas.  Sometime in May of 2009, Plaintiff obtained information that Gustin was interested in selling *his* Super Chevy Show. Plaintiff's representatives entered into negotiations with Gustin to purchase the Super Chevy Show.

8.     In October of 2009, an agreement was reached between Plaintiff and Gustin to purchase the Super Chevy Show (the "Contract").  *See* Exhibit A.  Generally, the Contract provided that Gustin/Auto Star would sell/transfer Super Chevy Show to Plaintiff.  Plaintiff, as part of the Contract, purchased the Name and Goodwill associated with Super Chevy Show.  *See* Section 1.4 of the Contract.  The Contract was initially executed to be effective the 1st day of October, 2009, with a Closing Date of October 28, 2009.  However, the initial Closing Date was extended, by Amendment No. 1 to Sales Agreement, until November 2, 2009, at which time, the closing occurred and Plaintiff began operating the "Super Chevy Show".

9.     In connection with the Contract, Plaintiff agreed to enter into a licensing agreement with Source Interlink, based in large part on the representations to Plaintiff that Source Interlink

*owned* a federally registered trademark in the phrase "SUPER CHEVY." Accordingly, based upon the claims and representations made by Source Interlink, that it owned a federally registered trademark in the phrase "SUPER CHEVY", Plaintiff entered into a licensing agreement (the "License Agreement") with Source Interlink. A true and correct copy of the License Agreement is attached as Exhibit B.

10.     After purchasing the Super Chevy Show from Gustin and after entering into the License Agreement, Plaintiff learned that Source Interlink had not further protected its alleged "SUPER CHEVY" federal trademark by filing a trademark application in Texas. Plaintiff, in order to further protect the asset it had purchased from Gustin, filed an application with the Texas Secretary of State, seeking to secure a trademark for "Super Chevy Show" and "SuperChevyShow.com" (or SuperChevy.comShow). Plaintiff secured trademark protection for both trademarks in February of 2012. *See* Exhibits C and C-1 attached hereto and incorporated for all purposes.

11.     Plaintiff, through its members, put on "Super Chevy Show" in multiple states for several years. In doing so, Plaintiff met all of its obligations under the License Agreement. However, by late 2013 and continuing into 2014, Source Interlink, its parent, and/or affiliates began to experience financial difficulty, which financial woes resulted in, among other things, the closing of a dozen of Source Interlink's magazines, as well as causing the dissolution of its distribution division. As such, Source Interlink began to fail to provide the services promised to Plaintiff under the License Agreement. Moreover, at that time, Source Interlink decided to "rebrand" itself and created its current alleged corporate persona - TEN: The Enthusiast Network Magazines, LLC.

12.     Unfortunately, by mid-to-late-2014, the damage was done. Defendants had failed to provide the services under the License Agreement and were in breach of that License Agreement. After repeated attempts by Plaintiff to get Defendants to remedy the defaults, Plaintiff was left with no choice, but to sever ties with the Defendants.

13.    On or about October 2, 2014, by letter through its counsel, Plaintiff notified Defendants that, due to material breaches by Defendants, Plaintiff was terminating the License Agreement. *See* Exhibit D.  Examples of Defendants' breaches include, but are not limited to, Defendants' failure to run the required advertising and editorial coverage for at least one Super Chevy Show event, in failing to protect Defendants' alleged "trademark" when Super Chevy Show was being used by US 13 Dragway in Delaware (*See* Exhibit E), and by failing to provide the expected distribution services in favor of Plaintiff (resulting from Source Interlink's unilateral decision to dissolve its distribution division).

14.    Shortly after Plaintiff's termination letter was sent to Source Interlink, Plaintiff learned for the first time that, despite the representations made by Source Interlink for years, neither Source Interlink nor TEN, nor any entity affiliated with either of the Defendants, owned, or had ever owned, a federally registered trademark in the phrase "SUPER CHEVY".

15.    Beginning in February, 2015, TEN (allegedly and apparently as successor in interest to Source Interlink) began contacting each of Plaintiff's members via cease-and-desist letters, claiming to have some vague and nebulous "intellectual property" rights in "SUPER CHEVY". (*See* Exhibit F).  Unfortunately, the Defendants' conduct did not stop there.

In addition, upon information and belief, TEN has been directly contacting third parties with whom Plaintiff had and has, both existing and potential contractual relations in connection with the Plaintiff's operation of its Super Chevy Shows.  In doing so, TEN continues to insist that TEN (and/or Source Interlink), own the "SUPER CHEVY mark" and that any continued use by Plaintiff's members would be regarded as "an act of willful trademark infringement."  The Defendants, also upon knowledge and belief, threatened third parties with legal action if those third parties did business with Plaintiff, or otherwise help Plaintiff promote, in any way, Plaintiff's Super Chevy Shows.

16.     To Plaintiff's knowledge and belief, third parties contacted by Defendants include, but are not limited to, Masters Entertainment Group, Inc., General Motors/Chevrolet and Discovery Channel/Velocity Network.  Such contacts by Defendants have caused those third parties to withdraw support, advertising and sponsorship from Plaintiff's "Super Chevy Show" if Plaintiff uses the Name and Goodwill it purchased from Gustin (and to which it owns and holds the Texas trademark rights), in connection with any of the events scheduled for 2015.

## CAUSES OF ACTION

### I.
### REQUEST FOR DECLARATORY JUDGMENT

17.     Plaintiff expressly incorporates by reference the foregoing paragraphs, as if set forth fully herein.

18.     Plaintiff asks this Court, pursuant to the Chapter 37 of the Texas Civ. Prac. & Rem. Code, Uniform Declaratory Judgments Act, to declare that Plaintiff is the owner and registered holder of legal rights under the Texas Trademark Act.  Specifically, that Plaintiff is the sole owner of the following duly registered Texas trademarks: (1) Super Chevy Show; and (2) Superchevyshow.com.

19.     Plaintiff would also ask the Court to declare that neither Defendant in this case has registered, either at the State or federal level, any trademark for SUPER CHEVY.

### II.
### TORTIOUS INTERFERENCE WITH SUPER CHEVY SHOW

20.     Plaintiff expressly incorporates by reference the foregoing paragraphs, as if set forth fully herein.

21.     In mid-2014, while Defendants were failing to provide all of the services to Plaintiff as required by the License Agreement, Plaintiff began searching for alternative marketing strategies. Plaintiff entered into negotiations with the Velocity Network ("Velocity"), an affiliate of the Discovery Channel ("Discovery") and was able to secure a marketing contract with Masters

Entertainment Group, Inc. ("Masters"), which would give Plaintiff's Super Chevy Show not just advertising but a television presence in 2015. (*See* Exhibit G) Since that time, Defendants have communicated threats of legal action toward Discovery and/or Velocity and/or Masters. As a result, Masters and Velocity have, at the direction of Discovery, modified the terms of the Television Agreement, which has left Plaintiff in an untenable position, with few options (1) accept the modified and detrimental marketing terms for its 2015 Super Chevy Shows; (2) being without media coverage; or (3) suing its advertising partner– none of which are acceptable to Plaintiff.

22.    Additionally, Plaintiff has had a long standing relationship with General Motors ("GM") and Chevrolet, which as a result of Defendants' threats, has stopped GM, in mid-negotiation, from completing a new sponsorship agreement (*See* Exhibit H), and has also resulted in barring Plaintiff from using GM's "Chevy Performance" in the 2015 events, unless or until Plaintiff and Defendants have resolved their dispute. (In doing so, Chevrolet has not indicated that they are in agreement with, or in support of, the Defendants' position, but rather have indicated that this is not Chevy's fight.)

23.    Defendants' intentional conduct is the sole reason that these contracts were either modified or terminated and have resulted in damages to Plaintiff.

### III.
### FRAUD AND FRAUDULENT INDUCEMENT

24.    Plaintiff expressly incorporates by reference the foregoing paragraphs, as if set forth fully herein.

25.    At the time the License Agreement identified above was entered into, Source Interlink knowingly and intentionally made false representations to Plaintiff as to material facts contained herein.  Specifically, the false representations included that Source Interlink owned a federally registered trademark in the phrase "SUPER CHEVY." In fact, Source Interlink did not then, nor does it today, hold any statutory or registered trademark, whether state or federal, in

"SUPER CHEVY" or any other alleged variation.  In fact, as stated in the Request for Declaratory Relief, Plaintiff is the holder/owner of the Texas trademark.

26.      Such knowing and false representations were made with the intent to induce Plaintiff to enter into the License Agreement.  Plaintiff relied on Source Interlink's false representations, to its detriment, in that under the terms of the License Agreement, Plaintiff paid Source Interlink, as it had agreed to in good faith.  As such, Plaintiff seeks repudiation of the License Agreement in its entirety, and asks that the Court find the License Agreement void, as it was incurred by fraud and for the sole purpose of extorting money from Plaintiff based on, at best, misrepresentations.

27.      As actual damages, Plaintiff seeks reimbursement for the all amounts Plaintiff paid to Source Interlink and/or TEN under the License Agreement, plus interest on those amounts.

28.      Additionally, because Source Interlink made the representations with full knowledge that it did not own a federally registered trademark, and as such, the representations described above were false at the time they were made, those representations were fraudulent and malicious and constitute conduct for which the law allows the imposition of exemplary damages.  As a result, Plaintiff will show that it has incurred significant expenses, including attorney's fees, in the investigation and prosecution of this action and, as set forth below, Plaintiff has the potential for damages under the License Agreement as a result of Defendants' actions, which exceed One Million Dollars ($1,000,000.00).  Accordingly, Plaintiff requests that exemplary damages be awarded against all Defendants, jointly and severally, in a sum within the jurisdictional limits of this Court.

## IV.
## DAMAGES

29.      As a result of the tortious conduct of the Defendants, Plaintiff has suffered actual damages, including but not limited to:

(1)      the consideration paid to Defendants under the License Agreement;

(2)      damages for lost Super Chevy Show revenues to be determined at trial;

(3)      reasonable attorneys' fees;

(4)    exemplary damages within the jurisdictional limit of the Court; and

## V.
## CONDITION PRECEDENT

30.    All conditions precedent to Plaintiff's institution of this suit have occurred and/or been performed.

## VI.
## ATTORNEYS' FEES

31.    Pursuant to Section 38.001, et seq. of the Texas Civ. Prac. & Rem. Code, Plaintiff seeks the recovery of its reasonable and necessary attorneys' fees expended in the prosecution of this action and an additional attorneys' fees in the event this matter is appealed to higher courts.

## VII.
## PRAYER

Wherefore, Plaintiff prays that Defendants be cited to appear and answer and that on final trial Plaintiff have judgment against Defendants, jointly and severally for the following:

(1)    Actual damages as may be proven at trial;

(2)    Exemplary damages within the jurisdictional limit of the Court;

(3)    Reasonable and necessary attorneys' fees;

(4)    Prejudgment and post-judgment interest as provided by law;

(5)    Costs of suit; and

(6)    All other relief to which Plaintiff may be entitled.

Respectfully submitted,

SHEEHY, LOVELACE & MAYFIELD, PC


__/s/ChristianJ.Hack_____
Christian J. Hack
*chack@slmpc.com*
State Bar No. 24041032
Peter K. Rusek
*prusek@slmpc.com*
State Bar No. 17400400
510 N. Valley Mills Drive, Suite 500
Waco, TX 76710
254.772.8022 Telephone
254.772.9297 Facsimile

ATTORNEYS FOR PLAINTIFF

# EXHIBIT A

## AGREEMENT

This Agreement (*"Agreement"*) is made and entered into this 1st day of October, 2009, by and between SCSW, INC., a Delaware Corporation, (*"Buyer"*) and AUTO STAR PRODUCTIONS, INC. (*"Seller"*).

## R E C I T A L S

Seller owns the business and assets of SUPER CHEVY SHOW. Seller desires to sell that business and assets to Buyer, and Buyer desires to purchase the same from Seller upon the terms and conditions hereinafter set forth.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual benefits to the parties, in reliance on the representations and warranties, conditions and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Purchase and Sale of Business and Certain Business Assets**. Seller hereby agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the business known as SUPER CHEVY SHOW (the *Business*) and the following described assets of the Business (the *"Purchased Assets"*) free and clear of all liens, claims and encumbrances:

    1.1 **Inventory**. All inventory, wherever situated, including work in process, as of the date this contract is executed.

    1.2 **Equipment**. All furniture, fixtures, equipment, machinery, tools, supplies and all other tangible personal property of every kind and description and wherever located and used in the Business, including but not limited to the items listed in the attached Exhibit A. All items listed in Exhibit A, as well as Books and Records, including electronic and paper files, located at 1226 Pike Street S.W., Etna, OH 43018, and 34 Northwood Ave, Franklin Furnace, OH 45629 are the total inventory included in the sale. The Buyer will be

responsible for removing the inventory within (10) days after the Close date or reach an agreement with seller to extend this time period.

**1.3**   **Books and Records.**  All books, all electronic files, records and papers of whatever nature and wherever located that relate to the Business or the Purchased Assets or which are required or necessary in order for Buyer to conduct the Business after the Closing.

**1.4**   **Name and Goodwill.**  The name "SUPER CHEVY SHOW" or any variant thereof and all associated goodwill including but not limited to logos, telephone and fax numbers, postal boxes and websites and domain names used in said business.  Any and all funds due to Seller from its sponsors during the 2009 season, but collected by Buyer through postal service during the transition period following the Closing, will be sent to Seller at the time each package is received.  Funds owed to Seller by its 2009 sponsors are not the responsibility of Buyer to make sure they are paid, just an obligation to forward packages as received.  Super Chevy Show logos and the telephone 800 number will be transferred to Buyer.  The local number, which belongs to three other Gustin Enterprises, will have Super Chevy Show calls forwarded to Buyer.  All website content will be transferred to buyer, with no obligation to any service contracts.

**2.**   **Purchase Price.**  The purchase price for the Purchased Assets (the *"Purchase Price"*) shall be the sum of $300,000.00.

**3.**   **Payment of Purchase Price.**  The Purchase Price of $300,000 shall be payable to Seller at Closing, upon documentation of released event contracts without prejudice and a signed five year agreement with Source Interlink.

**4.**   **No Assumption of Liabilities.**  The Purchased Assets are to be conveyed by Seller to Buyer free of any and all liabilities and claims and with good and clear title.  Buyer neither expressly nor impliedly assumes any liability under this Agreement.

5. **Closing**. The closing of the transactions described above (the *"Closing"*) shall take place at such time and date as may be mutually agreeable to the parties (the *"Closing Date"*) but in no event later than October 28, 2009. Seller shall, at Closing, deliver to Buyer duly executed transfer documents to transfer the Purchased Assets.

6. **Covenant Not to Compete**. Seller and Roger Gustin agree that for a period of three (3) years following the Closing Date, neither Seller nor any of his agents, shareholders, or employees will compete either directly or indirectly with the Business (Super Chevy Shows) that Buyer is purchasing hereunder within the continental United States. This non-competition agreement includes a prohibition against Seller assisting any other person or firm, as an employee, independent contractor or otherwise, in competing against Buyer in the above described business (Super Chevy Shows) within the designated area and within the designated time period. If any court shall determine that the duration or geographical limit of any restriction contained herein is not enforceable, it is the intention of the parties that the restrictive covenant set forth herein shall not thereby be terminated but shall be deemed amended to the extent required to render it valid and enforceable. Seller will assist Buyer with transition of operations for a period of (90) ninety days after the Closing. Seller agrees to attend the 2009 SEMA Show in Las Vegas at no charge or fee to Buyer except for all travel expenses including transportation, lodging, food, and entertainment approved in advance by Buyer. Seller does not agree to travel except for the SEMA Show. Seller agrees to further assist Buyer after Close date to secure sponsors or vendors for Super Chevy Shows, with an agreement between Seller and Buyer in regards to fees and expenses.

7. **Representations, Warranties and Covenants of Seller**. Seller warrants and represents to Buyer that the following are true and correct on and as of the date of this Agreement and will be true and correct as of the Closing Date and agrees as follows:

    7.1 **Authorization of Agreement**. Seller is an Ohio corporation and has the authority to enter into this Agreement and consummate the transactions contemplated hereunder and in doing so Seller will not be in violation of any provision of any law, rule, or regulation of any governmental body having jurisdiction, or any order, writ, injunction, decree, statute, rule, or regulation applicable to him or to the Purchased Assets.

**7.2** **Title to Assets**. Seller has good and indefeasible title to all of the Purchased Assets, and Seller will deliver same to Buyer free and clear of all security interests, mortgages, licenses, pledges, charges, liens or encumbrances of any nature whatsoever.

**7.3** **Disclosure**. The warranties and representations of Seller contained in this Agreement and the contents of every document delivered in connection herewith do not contain any untrue statement of a material fact and do not omit to state any fact necessary to make any statement herein or therein not misleading or necessary to a correct presentation of all material aspects of the business and the transactions contemplated under this Agreement.

**7.4** **Survival**. The representations and warranties, covenants and agreements by Seller that pertain to the Purchased Assets, as set forth in this Paragraph 7, shall survive the Closing. All of Sellers other representations and warranties, covenants and agreements shall expire 12 months from the date of closing.

**8.** **Representations and Warranties of Buyer**. Buyer warrants and represents to Seller that the following are true and correct on and as of the date of this Agreement and will be true and correct as of the Closing Date and agrees as follows:

**8.1** **Organization**. Buyer is a Corporation and is duly organized and validly existing in the State of Delaware.

**8.2** **Authorization of Agreement**. Buyer has the authority to enter into this Agreement and consummate the transactions contemplated hereunder and in doing so Buyer will not be in violation of any provision of any law, rule, or regulation of any governmental body having jurisdiction, or any order, writ, injunction, decree, statute, rule, or regulation applicable to it or to its property or assets.

**8.3** **Survival**. The representations and warranties, covenants and agreements of Buyer, as set forth in this Paragraph 8, shall survive the Closing.

Page 4

9.    **Indemnification**. Seller shall, from and after the Closing, indemnify and hold Buyer, its partners and employees, harmless from and against any and all losses, costs, liabilities, and expenses (including reasonable attorneys' fees) arising out of (i) any breach of warranty, representation, covenant or agreement made by Seller in this Agreement and (iii) all actions, suits, proceedings, demands, assessments, judgments, costs, and expenses incident to any of the foregoing.

Buyer shall, from and after the Closing, indemnify and hold Seller, its partners and employees, harmless from and against any and all losses, costs, liabilities, and expenses (including reasonable attorneys' fees) arising out of (i) any breach of warranty, representation, covenant or agreement made by Buyer in this Agreement and (iii) all actions, suits, proceedings, demands, assessments, judgments, costs, and expenses incident to any of the foregoing.

10.    **Contingency**. An obligation of Buyer to close this transaction is contingent upon Buyer entering into an acceptable five (5) year licensing agreement with Source Interlink and Seller to retain FSM as its agency of record during the transition time between when this Agreement is signed, and the Closing takes place.

11.    **Disclosure**. Seller will disclose the event contracts signed for 2010 and future dates. Buyer will provide Seller a list of events to be terminated within (5) five days after the signing of this Agreement.

12.    **Miscellaneous Provisions.**

12.1    **Expenses**. Each party to this Agreement shall bear all costs, charges, and expenses incurred by the party in connection with this Agreement and the consummation of the transaction contemplated by this Agreement, including, but not limited to, all fees and expenses of their respective agents, representatives, counsel and accountants.

12.2    **Entire Agreement**. This Agreement contains the entire understanding between the parties concerning the subject matter contained in this Agreement. There are no representations, agreements, arrangements or

understandings, oral or written between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER:

ALTO STAR PRODUCTIONS, INC.

By: _Roger Alestis_  10-1-09

_100% PERCENT_ Sole shareholder

BUYER:

SCSW, INC.

By: _NM Duly_  10-6-09

_____

Page 6

<u>**Schedule A**</u>
*As provided by Seller*

<u>**OFFICE EQUIPMENT**</u>
Four (4) ---- DELL / COMPAQ--- Desk Top Computers 2-03

One (1) HP - Copier 2-03

One (1) HP Fax/Scanner/Printer 07

One (1) CANNON Printer/Copier Mounted in Trailer 08

One (1) Binder Machine for sponsor proposals

One (1) Laminating Machine for sponsor hard cards

Four (4) Old Laptops in poor condition

<u>**EVENT OPERATIONS EQUIPMENT**</u>
One (1) sponsorship agreement with PRO COMM RADIOS for event staff 2-way
   radios. Sponsorship contract expires 12-1-2011

One (1) title to FEATHERLITE 27 foot trailer, acquired through previously paid
   contract

One (1) sponsorship agreement with FEATHERLITE 32 foot trailer. Sponsorship
   contract expires 12-1-2010

Three ( 3 ) titles to used SUZUKI 2-wheel drive 4-Wheelers

One ( 1) used sound system for Car Show Awards

One (1) A-Board sign for the drag strip starting line

Miscellaneous set up equipment for Car Show area including signs and banners

## AMENDMENT NO. 1 TO SALES AGREEMENT

WHEREAS, AUTO STAR PRODUCTIONS, INC., ("Seller") has entered into an Agreement with SCSW, INC., ("Buyer") for the purchase of the SUPER CHEVY SHOW; and

WHEREAS, such Agreement was entered into on or about September 29, 2009, and was scheduled to close on or about October 28, 2009; and

WHEREAS, both Seller and Buyer have agreed to extend the Closing Date to November *6, 2 F6* 2009;

NOW, THEREFORE, for mutual promises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1. Closing of the transaction described in the original Contract shall occur on or before November *8, 2009.* *2 F6*

2. The remaining terms and provisions of the Contract shall remain in full force and effect.

EXECUTED this *3* day of October, 2009.

SIGNED: *Roger Gustin*

SELLER
AUTO STAR PRODUCTIONS, INC.

By: *ROGER GUSTIN*

SIGNED:

BUYER
SCSW, INC.

By: _____

*P6 PER VERBAL AGREEMENT 10-29-09 WITH RYAN HAAS, BILLY MEYER, SECRETARY-TREASURER OF SCSW INC., WILL WIRE DEPOSIT THE TOTAL SUM OF $300,000.00 TO AUTOSTAR PRODUCTIONS MONDAY NOV. 2, 2009.*

K:\CASES\M348-043.bwf\Amendment No. 1 to Sales Agmt.wpd

## BILL OF SALE

Know All Men by These Presents: That AUTOSTAR PRODUCTIONS, INC., an Ohio corporation, in consideration of One Dollar ($1.00) and other valuable considerations, to them, paid by SCSW INC., the receipt of which is hereby acknowledged, does hereby **grant, bargain, sell, transfer, and deliver** unto the said  SCSW  INC., the following described goods and chattels, to-wit:

**All rights to the Super Chevy Shows as described in the Contract between SCSW Inc. and Autostar Productions, Inc., including but not limited to the equipment listed in Exhibit "A" attached hereto.**

To have and to hold the same unto the said SCSW  INC., it successors  and assigns forever.

And the said AUTOSTAR PRODUCTIONS, INC., for itself and its successors and assigns, does hereby covenant with the said SCSW  INC., its successors and assigns, that it is the true and lawful owner of said described property hereby sold, and has full power to sell and convey the same; that the title, so conveyed, **is clear, free, and unencumbered**; and further that it does warrant and will defend the same against the claim or claims of all persons whomsoever,

IN EXECUTION WHEREOF, AUTOSTAR PRODUCTIONS, INC., has caused its corporate name to be subscribed hereto by Roger Gustin, its President, thereunto duly authorized by Resolution of its Board of Directors, this 28 day of OCTOBER 2009.

AUTOSTAR PRODUCTIONS, INC.

By: _____

Roger Gustin, President

**STATE OF OHIO**

# EXHIBIT B

## LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into as of November__, 2009 ("Effective Date"), by and between Source Interlink Magazines, LLC, a Delaware limited liability company, with a place of business at 831 S. Douglas Street, El Segundo, California 90245 ("Licensor" or "SIM") and SCSW, Inc. ("Licensee"), a Delaware corporation, with its principal place of business located at 3511 Silverside Road, Suite 105, Wilmington, DE 19810. Licensor and Licensee shall be referred to collectively hereinafter as the "Parties."

1.     **Definitions**. The following capitalized words shall have the meanings indicated in this Agreement:

        (a)     Licensed Property means the following trademark owned by Licensor: SUPER CHEVY.

        (b)     Licensed Event or Licensed Events means the automotive events branded as SUPER CHEVY SHOWS as conducted by Licensee in accordance with the terms and conditions of this Agreement.

        (c)     Distribution Channels means: automotive race tracks and drag strips.

        (d)     Intellectual Property Rights means all rights arising or protectable under the patent, trademark, copyright, trade secret, or similar laws of the United States or any foreign nation.

        (e)     Magazine means *Super Chevy* magazine, which is owned and published by Licensor.

        (f)     Gross Revenue means all revenue received or generated by Licensee in connection with the exercise of its license rights hereunder.

        (g)     Territory means the United States, its territories and possessions.

2.     **Grant of License.**

        (a)     Grant: Subject to the terms and conditions set forth in this License Agreement, Licensor hereby grants to Licensee the limited, exclusive, fee-bearing, revocable, and right and license to use the Licensed Property on and within the Licensed Event in the Distribution Channels throughout the Territory during the Term.

        (b)     License Limitations and Prohibitions.

                (i)     During the Term, the license rights granted herein shall remain in force to the fullest extent that Licensor has, or may hereafter obtain, the right to use the Licensed Property in connection with the Licensed Event and/or the Merchandise. If Licensor's rights in

1

-and to the Licensed Property cease or is called into question for any reason, Licensor may terminate Licensee's license rights with respect to the Licensed Property.

       (ii)    No license is granted hereunder for the use of the Licensed Property for any purpose other than in connection with the Licensed Event or the sale of approved Merchandise.

       (iii)    Except as expressly authorized herein, Licensee shall not authorize any other party to use, market, develop, or otherwise commercially exploit the Licensed Property and/or the Licensed Event.

       (iv)    Licensee intends to conduct no less than ten (10) Licensed Events in any calendar year during the Term of this Agreement, and may conduct an unlimited number of Licensed Events based on a schedule of events mutually agreed to by the Parties.

       (v)    All rights in the Licensed Property not expressly granted herein are withheld and reserved by Licensor.

       (c)    <u>Credit and Trademark/Copyright Notice(s)</u>:  Licensee shall cause to appear on or in the Merchandise and the Licensed Event such trademark and copyright notices and legal lines as directed by Licensor.

       (d)    Licensee shall have the right to sub-license the rights granted herein to the owners of each of the Licensed Events solely for carrying out the obligations set forth herein at each Licensed Event.  Licensee shall remain responsible for ensuring that any sub-licensees comply with the terms and conditions of this Agreement.  In the event that any sub-licensee breaches any of the terms of this Agreement, Licensee shall be fully responsible and liable for such breaches by sub-licensees.  At any time during the term of this Agreement, Licensor may request a copy of Licensee's agreements with any sub-licensees and Licensee shall provide full and unredacted copies of such agreements within ten (10) business days following a written request from Licensor.

       (e)    Licensee understands and agrees that the owners of the Licensed Events are intended third party beneficiaries of this Agreement.  In the event that Licensor terminates this Agreement for cause and Licensee cannot or does not satisfy the contractual obligation giving rise to the termination, Licensor may seek relief directly from the individual track owner whose act or omission gave rise to the termination.

3.    <u>Approvals Relating to the Licensed Event</u>

       (a)    In the sixty (60) day period immediately following the mutual execution of this Agreement, Licensee and Licensor shall meet to discuss (the "Kick Off Meeting") the current and future plans for the Licensed Event and the coverage of the Licensed Events in the Magazine.  The Kick Off Meeting shall cover the following elements:

| | |
|---|---|
| (i) | proposed branding of the Licensed Event; |
| (ii) | proposed marketing of the Licensed Event; |
| (iii) | the use of Licensor's logos in connection with the Event; |
| (iv) | proposed race formats; |
| (v) | proposed vehicle types to be participating in the Licensed Event; |
| (vi) | proposed vehicle classes to be participating in the Licensed Event; |
| (vii) | proposed admission pricing for the Licensed Event; |
| (viii) | proposed car show format for the Licensed Event; and |
| (ix) | proposed awards to be given at the Licensed Event. |

(b)     If the Kick Off Meeting does not occur in the prescribed 60-day period, Licensor may transmit a material breach letter to Licensee and Licensee shall have thirty (30) days to cure such material breach by participating in the Kick Off Meeting. If Licensee fails to cure the material breach, Licensor may terminate this Agreement for cause. In no event shall Licensee conduct a Licensed Event prior to the occurrence of the Kick Off Meeting.

(c)     Merchandise.  Licensee may use the Licensed Property on merchandise (the "Merchandise") sold at any Licensed Event and/or during the Post-Event Period (as defined below) provided that the Merchandise is approved by Licensor in accordance with the following procedures:

(i)     The styles, designs, packaging, contents, workmanship, and quality of all Merchandise must be approved by Licensor prior to the distribution or sale of the Merchandise. Licensor's right of prior approval also applies to all advertising, press releases, labeling, point of sale materials, trade show displays, and sales materials relating to the Merchandise.

(ii)     Before selling, advertising, or distributing any Merchandise, Licensee shall provide to Licensor, free of cost, for Licensor's approval at least the following with respect to such category of Merchandise: (i) prototypes or finished artwork; (ii) a pre-production sample of the product in each category of the Merchandise along with all product packaging materials; and (iii) all such samples as Licensor may reasonably request.

(iii)     Any material, item, or article submitted to Licensor for approval shall be deemed disapproved unless Licensor specifically approves such material, item, or article in writing within fifteen (15) days following Licensor's receipt of the applicable material, item, or article.

(iv)     After any Merchandise is manufactured, Licensee shall provide Licensor with four (4) samples of each type of Merchandise, and an additional two (2) samples of each type of Merchandise upon Licensor's written request, to enable Licensor to monitor compliance with the standards set forth in this Agreement.

(v)     If Licensee fails to obtain Licensor's prior approval for any Merchandise and Licensee releases such Merchandise into the Distribution Channel, Licensee agrees to pay liquidated damages for the breach in an amount equal to twice the royalty rate owed on each item of Merchandise sold in violation of the prior-approval requirement. The royalty required under

3

this provision must be paid by Licensee irrespective of whether Licensee has exceeded $2,000,000 in annual Gross Revenues in connection with the Licensed Event.

     (vi)    All Merchandise shall be manufactured, sold, labeled, packaged, distributed, and advertised in accordance with all applicable laws and regulations, including federal, state and local laws and regulations governing consumer product safety and the like.

     (vii)    In the event that any automotive manufacturer complains about the use of Licensed Property on or in association with the Merchandise, Licensee shall be fully responsible for securing a license from such manufacturer and/or paying any royalties to such manufacturer.

     (viii)   For the purposes of this Section 3(c), "Post-Event Period" means the 6-month period immediately following the conclusion of the Licensed Event to which the applicable Merchandise relates.

     (d)    Promotional Materials Relating to Licensed Events.  With respect to all press releases, post cards, e-mail blasts, flyers/posters, and other materials promoting any of the Licensed Events (collectively "Promotional Materials"), Licensee need not secure the prior approval of Licensor to circulate any such Promotional Materials if Licensee is displaying the Licensed Property on the Promotional Materials in a manner identical to the depiction of the Licensed Property on the digital images of the Licensed Property released by Licensor to Licensee.  Licensor may from time to time request that Licensee provide samples of Promotional Materials to confirm that Licensee is using the Licensed Property exactly as authorized by Licensor.  Licensee shall have no authority to alter or modify the Licensed Property as depicted on any Promotional Materials.

## 4.   Additional Requirements Applicable to Licensee

     (a)    Licensee's Advertising Requirements.  Licensee will use its best efforts to promote the Licensed Events.  Licensee shall also use its best efforts to provide the following:

     (i)    specifically designated and ample space on the Performance and Restoration Marketplace at all Licensed Events to promote, market and sell the Magazine and other related products, including "goody bags," which shall be provided by Licensor in connection with the Licensed Event and the Magazine;

     (ii)    If Licensee produces a event guide for the Licensed Event, Licensor shall receive one (1) full page color advertisement in the guide;

     (iii)   Licensee shall provide advertising space on the Licensed Event website to Licensor.  The advertising space shall appear on every single page, (above the "fold") in order for Licensor to promote, market and sell the Magazine and its branded products.  Advertising space to be no less than 300 x 400 dpi;

     (iv)   ten (10) announcements per Licensed Event to promote the Magazine in which content of copy shall be provided by Licensor;

     (v)    copy from the editorial content of the Magazine in all radio, television, cable, internet promotions conducted by Licensee;

4

(vi)     golf carts or other similar type of transportation at the Licensed Events for SIM staff at no cost to SIM if the golf car expense does not exceed $500 per Licensed Event, provided, however, that SIM shall be responsible for golf car expenses exceeding $500 per Licensed Event;

(vii)    tickets to all the Licensed Events for all attending SIM employees; and

(viii)   twenty-four (24) extra tickets per Event to be used at SIM's sole discretion.

(b)     <u>Website Requirements</u>.

(i)      Licensee, at its own expense, shall build a separately-branded web site with the look and feel of Licensor's Super Chevy web site (the "Event Website"). The Event Website must include event-related information, contact information, and a link to Licensor's Super Chevy web site. Before launching the Event Website, Licensee shall secure the written approval of Licensor's web editor to ensure consistency with Licensor's brand positioning on Licensor's Super Chevy web site.

(ii)     If Licensee fails to launch the Event Website on or before January 15, 2010, Licensor may give notice of a material breach and Licensee shall have sixty (60) days to cure the material breach. If Licensee fails to cure the material breach within the 60-day cure period, Licensor reserves the right to terminate this Agreement for cause.

(c)     <u>Digital Asset Management System</u>. Licensee understands and agrees that Licensor maintains a digital asset management system that is used to release Licensor's digital assets and other intellectual property assets to licensees for use in accordance with this Agreement. Licensee shall comply with the terms and conditions of the digital asset management system and shall submit all artwork, product packaging, mock ups, and all other materials capable of digital reproduction to Licensor via Licensor's digital asset management system.

(d)     <u>Line List Requirement</u>. Licensee shall provide Licensor with a complete line list of each item in development on a quarterly basis or upon written request by Licensor and shall be sent to Source Interlink Media – Enterprises Division, 831 S. Douglas Street, El Segundo, CA 90245, Attn: Creative Director. The line list provided by Licensee shall substantially conform to Exhibit B, which is attached hereto.

5.     <u>Licensor's Obligations and Rights</u>

(a)     Licensor shall undertake the following activities in connection with the Licensed Events:

(i)      with respect to each Licensed Event conducted (excluding cancellations and rain-outs) by Licensee, Licensor shall provide 1 full page advertisement (full color) and 2 pages of editorial coverage in the Magazine.

(ii)     with respect to editorial content included in the Magazine relating to the Licensed Events, at Licensor's option, content will be created by Licensor's editorial staff or the

5

content will be provided by Licensee at no costs to Licensor.  Licensor at all times retains editorial discretion to determine what content is included in the Magazine.  The schedule for the Licensed Event will be included in a 1-column side-bar story (included in the total page count).

          (iii)     Event logo posted on first page of the event editorial coverage in the Magazine.

          (iv)     Event editorial coverage posted on the superchevy.com website.

          (v)     Event promotion in the "Bowtie Brief" section of the Magazine.

     (b)     Licensor may promote the Licensed Event through other means, media, and platforms as determined in the sole discretion of Licensor.

     (c)     Notwithstanding anything herein to the contrary, Licensor retains absolute editorial discretion concerning the Magazine, any content to be included in the Magazine relating to the Licensed Event, and any content to be posted on any Licensor web site concerning the Licensed Event.  Licensee recognizes that if a Licensed Event is canceled or shortened due to any reason (including weather), Licensor's obligations under Section 5(a) shall be adjusted accordingly in Licensor's reasonable discretion.

     (d)     Event Coverage.

          (i)     Licensor shall be given full access to all Licensed Events.

          (ii)     Licensor shall have the right to publish the coverage of the Licensed Events in Licensor's publications and on Licensor's' web sites. Licensor shall own all right, title and interest to content created and produced by Licensor in all media (including print, digital, and video) relating to the Licensed Events.

          (iii)     Licensor shall be given the first right to publish Licensed Event content created and produced by Licensee.

          (iv)     Licensor, at its own expense, shall cover up to ten (10) Licensed Events per calendar year.  In the event that Licensee requests that the Magazine cover more than ten (10) Licensed Events in any calendar year, Licensee shall pay the reasonable travel expenses of Licensor's personnel covering the additional (more than 10) Licensed Events for the Magazine.

6.     Terms of Payment.

     (a)     All payments required hereunder shall be sent and made payable to Source Interlink Media, LLC attn: Enthusiast Media-Licensing, PO Box 933858, Atlanta, GA 31193-3858.  All payments shall be in U.S. Dollars.   There shall be no refunds by Licensor of any payments made hereunder.

     (b)    <u>Annual Statements</u>.  Licensee shall deliver annual statements for each Licensed Event no later than December 1 of each calendar year in which this Agreement is in effect.  Each annual statement shall detail the Gross Revenues earned by each Licensed Event with itemized totals for each revenue stream associated with the Licensed Event, including without limitation national sponsorship revenue.  The annual statements shall be sent to Source Interlink Media, LLC, attention: Enterprises Division - Finance, 831 S. Douglas Street, El Segundo, CA 90245.

     (c)    <u>Interest</u>:  Interest on past due payments shall be paid by Licensee at the rate of one percent per month or the maximum rate permitted by law, whichever is lower, and shall accrue on each unpaid amount from the first day payment becomes due through the date of payment.  A late payment shall be deemed "late" if such payment is not made within ten (10) business days following the date each payment is due.

     (d)    <u>Expenses of the Parties</u>.  Each party will bear its own costs and expenses incurred in carrying out its obligations under this Agreement.  In computing Gross Revenue, Licensee shall be entitled to no deductions for expenses incurred in connection with the operation, management, advertising, promotion, or sale of the Licensed Events.  Further, in computing Gross Revenue, Licensee shall not deduct or otherwise take into account a general credit extended to a customer if such credit relates to products other than the Licensed Event.

7.    <u>Minimum Guarantee</u>

     (a)    <u>Minimum Guarantee Payment in 2010/2011</u>.  As a condition of entering into this Agreement, Licensee promises to pay Licensor an annual minimum guarantee (collectively the "Minimum Guarantee") of two hundred and twenty thousand dollars ($220,000) to be paid by Licensee in accordance with the payment schedule set forth below.  The annual Minimum Guarantee of $220,000 shall be paid by Licensee even if the number of Licensed Events in a calendar year falls below ten (10), and Licensee shall be entitled to no pro-rata or other deduction based on the fact that the number of Licensed Events held in any given calendar year fell below ten (10).  If the number of Licensed Events in any calendar year exceeds ten (10), Licensee will be required to pay Licensor an additional minimum guarantee of $22,000 per additional Licensed Event.  The additional minimum guarantee of $22,000 is due 30 days prior to the first day on which the additional Licensed Event is scheduled to occur.

Unless Licensee elects to pay the Minimum Guarantee in accordance with the schedule set forth in Section 7(b) below, the following payment schedule applies to each calendar year:

        (i)    $22,000 due March 17;
        (ii)    $22,000 due March 24;
        (iii)    $22,000 due April 22;
        (iv)    $22,000 due May 12;
        (v)    $22,000 due May 19;
        (vi)    $22,000 due June 17;
        (vii)    $22,000 due July 14;
        (viii)    $22,000 due July 21;
        (ix)    $22,000 due August 25;

7

(x)   $22,000 due September 16.

(b)   Discount for Pre-Payment of the Annual Minimum Guarantee.  Licensee may elect to pay the entire annual Minimum Guarantee amount on or before January 15 of each calendar year in which the Licensed Events are scheduled to occur.  If Licensee so elects, it must give Licensor written notice of the election on or before December 1 of each calendar year.  In the event that Licensee elects to pre-pay the annual Minimum Guarantee amount, Licensee shall be entitled to a ten percent (10%) discount on the annual Minimum Guaranteed amount owed to Licensor.  By way of example only, if Licensee conducts 10 Licensed Events and the annual Minimum Guarantee amount is $220,000, Licensee shall be entitled to a discount of $22,000 if it pays $198,000 on or before January 15 of the next calendar year.  If Licensee pre-pays the annual Minimum Guarantee amount and conducts additional Licensed Events in excess of those planned at the time of the pre-payment, Licensee shall pay any additional Minimum Guarantees owed to Licensor in accordance with Section 7(a) above.

(c)   Minimum Guarantee After 2011.  The Minimum Guarantee set forth in Section 7(a) above shall apply to calendar years 2010 and 2011.  During the period from November 1, 2011 to December 15, 2011, the Parties shall meet in good faith to evaluate the Minimum Guarantee to be paid by Licensee in calendar years 2012 and 2013.  In no event shall the annual Minimum Guarantee increase or decrease by more than ten percent (10%).  If the Parties cannot reach agreement on or before December 15, 2011, the Minimum Guarantee shall remain as provided in Section 7(a) above.  The foregoing reevaluation process also shall be undertaken by the Parties in the period from November 1, 2013 to December 15, 2013 with respect to the annual Minimum Guarantee to be paid by Licensee in calendar years 2014 and 2015.

(d)   Acceleration of Minimum Guarantee.  In the event that Licensor terminates this Agreement for any reason, the entire remaining Minimum Guarantee amount owed by Licensee at the time of termination shall be deemed fully earned by Licensor and shall become immediately due and payable to Licensor no later than thirty (30) days following the effective date of termination of this Agreement.

8.   Audit.

(a)   During the Term of this Agreement and for three years following the termination or expiration of this Agreement, Licensee will keep full and complete records of all transactions relating to the sale, distribution, or other commercial exploitations of the Licensed Events.

(b)   During the Term of this Agreement and for three (3) years following the termination or expiration of this Agreement, Licensor or Licensor's designees shall have the right, at its sole cost and expense, to audit or appoint a certified public accountant to audit Licensee's books and records.  Such examination shall be for a reasonable duration, shall take place at the principal executive office of Licensee that is the subject of examination, on reasonable prior written notice (not less than ten (10) business days) and shall not occur more than one (1) time in any twelve (12) month period during the Term.  Licensor may audit more frequently if a prior audit reveals an underpayment exceeding five percent (5%) in the relevant period.

8

(c)     The audit rights granted herein will be limited to only those books, records and accounts specifically applicable to this Agreement and not to Licensee's business as a whole. Any audit performed shall comply with Licensee's reasonable security and/or other confidentiality restrictions.

(d)     In the event that an examination or audit of Licensee's books and records shall reveal that amounts payable were understated, then Licensee shall pay to Licensor, within thirty (30) days after notice, the full amount understated plus accrued interest plus the costs and expenses incurred by Licensor in conducting the audit, including reasonable attorneys' fees and other professional advisor fees incurred in connection with the audit.

(e)     Licensee shall ensure that all owners of the Licensed Events maintain books and records in compliance with this Section.

## 9.     Indemnification

(a)     During the term of this Agreement and for two years following the termination or expiration of this Agreement, Licensee shall indemnify, defend and hold harmless Licensor, its parent company, subsidiaries, and affiliates and their respective officers, directors, shareholders, members, managers, employees, agents and assigns from any and all claims by third parties including, but not limited to, liabilities, judgments, damages, losses, costs and expenses (including attorneys' fees and settlement amounts) arising from or relating to: (i) a breach by Licensee or sub-licensee of any obligation under this Agreement; (ii) a breach by Licensee or sub-licensee of any warranty or representation in this Agreement; (iii) any claim arising out of Licensee's or sub-licensee's operation, promotion, advertising, and/or administration of the Licensed Events, including without limitation claims for personal injury or property damage asserted by any persons participating in the Licensed Events; (iv) any claim arising out of Licensee's or sub-licensee's sale of the Merchandise; or (v) the negligence or willful misconduct of Licensee, Licensee's agents employees, or affiliates, any sub-licensee, and/or any of sub-licensee's agents, employees, or affiliates.

(b)     During the term of this Agreement and continuing as long as Licensee is authorized to conduct the Licensed Events, Licensor shall indemnify, defend and hold harmless Licensee, its parent company, subsidiaries, and affiliates and their respective officers, directors, shareholders, members, managers, employees, agents and assigns from any and all claims by third parties including, but not limited to, liabilities, judgments, damages, losses, costs and expenses (including attorneys' fees and settlement amounts) arising from or relating to: (i) a breach by Licensor of any obligation under this Agreement; (ii) a breach by Licensor of any warranty or representation in this Agreement; (iii) any claim arising out of Licensee's authorized and permitted use of the Licensed Property in the United States.

(c)     The indemnification obligations set forth in this Section are contingent upon the indemnified party: (i) giving the indemnifying party prompt notice of the indemnification-triggering claim; (ii) reasonably cooperating with the indemnifying party, at indemnifying party's expense, in the defense of such claim; and (iii) giving the indemnifying party the right to

9

control the defense and settlement of such claim, except that the indemnifying party shall not enter into any agreement that affects the indemnified party's rights or interest without the indemnified party's prior written consent. The indemnified party's failure to give prompt notice shall not relieve the indemnifying party of its indemnification obligations under this Section unless such failure materially prejudices the indemnifying party.

10.   **Insurance**

Throughout the Term and for three (3) years following the termination or expiration of this Agreement, Licensee shall obtain and maintain the following types of insurance coverage from a reputable and financially sound insurance company reasonably approved by Licensor: (a) Commercial General Liability insurance with a minimum limit of $5,000,0000 per occurrence, including bodily/personal injury product liability, property damage, and advertising injury insurance; and (b) event insurance, racing insurance, and/or any other insurance customarily procedure by car track owners or operators of automotive events with a minimum limit of $5,000,0000 per occurrence. . All such insurance policies shall provide that **"Source Interlink Media, LLC and its Parent Companies, Subsidiaries and Affiliates" be "additional insureds;"** that same may not be modified or canceled without at least thirty (30) days prior written notice to Licensor; that the "other insurance" clause, if any, will be deleted from such policy; that the insurance under such policy shall be primary; and that other insurance in force is neither primary nor contributing. As proof of such insurance, a fully paid certificate of insurance shall be provided by Licensee within ten (10) business days following the mutual execution of this Agreement. Licensor shall have the right to approve the insurance certificate and such approval must be secured before any Licensed Article is manufactured, distributed, advertised, or sold hereunder. If Licensee fails to maintain such insurance during the Term of this Agreement, Licensor may, but shall not be obligated to, maintain same during the required period and in such event Licensee shall reimburse Licensor the cost of the premiums thereof. As used in this paragraph, "Licensor" shall also include Licensor's licensor(s), grantor(s), subsidiaries, affiliates, officers, directors, agents, and employees. Licensee shall ensure that all owners of the Licensed Events maintain insurance coverage in compliance with this Section.

11.   **Ownership of Intellectual Property Rights**

(a)   Licensor owns all right, title, and interest, including all Intellectual Property Rights, in and to the Licensed Property. With respect to the Licensed Property, Licensor shall have the right, at its own expense and discretion, to seek protection for, register, and perfect all Intellectual Property Rights arising out of or relating to the Licensed Property or the Licensed Event. Following the Term, all Licensed Property shall continue to belong to Licensor. Nothing herein shall be construed as conveying or transferring ownership to Licensee in the Licensed Property or the Magazines.

(b)   <u>Trademarks and Goodwill.</u>

(i)   <u>Licensed Property</u>. Licensee recognizes the great value of the good will associated with the Licensed Property and acknowledges that all Intellectual Property Rights associated therewith and good will attached thereto belongs exclusively to Licensor, that the

10

Licensed Property has secondary meaning in the minds of the public, and that all use of the Licensed Property will inure to the benefit of Licensor. Licensee agrees that it will not, during the term of this Agreement or thereafter, challenge or contest Licensor's Intellectual Property Rights in and to the Licensed Property, or attack the validity of this Agreement.

       (ii)   Licensed Events. Licensee shall take no action to register or attempt to register any trademarks, service marks or other identifiers of source associated with the Licensed Events. In any dispute between the Parties, Licensee shall not contest the validity of any trademarks, service marks or other identifiers of source associated with the Licensed Events, and Licensee shall take no action to impair or dilute the value of any trademarks, service marks or other identifiers of source associated with the Licensed Events.

## 12.   Term and Termination

       (a)   Term. This Agreement, and all rights granted to Licensee hereunder, shall commence on the Effective Date and shall remain in full force and effect until December 31, 2015, unless terminated sooner in accordance with this Agreement.

       (b)   Termination for Cause. Except for payment breaches governed by subsection (c) below, either party may terminate this Agreement for cause if the other party materially breaches this Agreement and such material breach remains uncured for thirty (30) days following the date of a written notice from the non-breaching party specifying the material breach and requiring its cure.

       (c)   Payment Breach. Licensee understands and agrees that any failure to make a payment required hereunder shall be regarded as a material breach of this Agreement. A Payment Breach shall occur if: (i) Licensee fails to make a payment by any payment deadline set forth herein or within the time prescribed by this Agreement; and (ii) Licensee further fails to make such payment after taking into account any applicable grace period provided hereunder. Upon the occurrence of a Payment Breach, SIM may transmit a written notice of termination to Licensee advising the Licensee of the Payment Breach and requiring the cure of the Payment Breach within twenty (20) calendar days following the date of the written notice. If Licensee fails to cure the Payment Breach within the 20-day cure period, SIM may terminate this Agreement by providing written notice to Licensee, which written notice of termination shall take effect on receipt by Licensee.

       (d)   Termination for Convenience. Either party may terminate this Agreement for convenience in writing only during the 120-day period immediately prior to January 1, 2014.

       (e)   Licensor's Immediate Termination Rights. Licensor may terminate this Agreement without an opportunity to cure in the event that Licensee materially breaches any of the license restrictions set forth in Sections 2(b)(ii) and/or 2(b)(iii) of this Agreement.

       (f)   Impairment of Good Will. In Licensor's sole discretion, if the good will of the Licensed Property is compromised in any significant manner as a result of a material breach by Licensee, Licensor will have the right to terminate this Agreement for cause with fifteen (15)

business days advance written notice to Licensee, and Licensee shall have no opportunity to cure the breach giving rise to the injury to good will.

(g)     Licensee may terminate this Agreement with thirty (30) days prior written notice in the event that the Magazine permanently ceases publication; provided, however, that the termination right granted herein shall not apply in the event that Licensor elects to publish the Magazine less than six (6) times in any calendar year in which this Agreement is in effect.

(h)     In the event that Licensee fails to cure a material breach (excluding a payment breach) within the time prescribed by this Agreement and such material breach arose from the acts or omissions of only one track owner, Licensor in its discretion may elect to terminate Licensee's rights to conduct the particular Licensed Event that was involved in the material breach without terminating this Agreement in its entirety.

(i)     <u>Track Rental Agreements</u>.  At all times during the Agreement, Licensee shall use its best efforts to assure that all track rental agreements entered into during the Term are freely assignable by Licensee to Licensor in the event that this Agreement is terminated.

(j)     <u>Effect of Termination</u>.  Upon the expiration or termination of this Agreement for any reason: (1) Licensee shall immediately cease all use of the Licensed Property and shall have no further authority to promote, advertise, conduct, administer, or otherwise operate the Licensed Events; and (2) Licensee shall assign and transfer to Licensor any domain name registered by Licensee bearing or containing any trademark or service mark of Licensor.

13.     <u>Confidentiality</u>

(a)     For the purposes of this Agreement, the term "Confidential Information" means: (i) any information of a party (or its affiliates) that is proprietary in nature and clearly marked as "confidential" or which would reasonably be considered confidential that is provided by one party to the other party in connection with its performance under this Agreement; (ii) any information a party (or its affiliates) is required to preserve as confidential under law; (iii) the terms, conditions, and pricing contained in this Agreement and all records required to be generated under this Agreement; and (iv) all other information that gives the disclosing party a competitive business advantage in its industry or market.

(b)     Except as otherwise provided in Section 7 of this Agreement, during the term of this Agreement and for one (1) year following the termination or expiration of this Agreement, each party agrees to maintain in confidence, except as is otherwise necessary to fulfill the parties' obligations hereunder, the Confidential Information of the other party.  Each party shall apply the same protections to the other party's Confidential Information that it applies to its own information of like value, but in no event less than commercially reasonable protections.  Neither party shall disclose the Confidential Information of the other to any third party, and shall disclose such Confidential Information with its own company only to those persons with a need to know.

(c)     Notwithstanding the above, information shall not be considered confidential to the extent that: (i) it was in the public domain at the time of disclosure, or enters the public domain

12

thereafter; (ii) was properly known to the receiving party prior to such disclosure; or (iii) was independently developed by the receiving party without access to the discloser's information.

14.     **Warranties of Licensee.**  Licensee represents and warrants as follows:

(a)     It has the full right, power and authority to enter into this Agreement.

(b)     It is has entered into no other agreement or otherwise is bound by no other obligation that would prevent it from rendering the services described herein to Licensor.

(c)     The Licensed Event, as operated and managed by Licensee, will not infringe the Intellectual Property Rights of any third person or party.

(d)     The Licensed Event shall comply with all applicable federal and state laws and regulations.

(e)     The Licensed Event shall conform to the standards prevailing in the automotive event industry for automotive events of similar size.

(f)     Licensee will use its best efforts to ensure that the Licensed Events reflect positively on Licensor's good will and does not impair or adversely affect the good will of Licensor or the Licensed Property.

15.     **Press Releases.**  Neither party shall issue a press release or otherwise make a public announcement concerning this Agreement or the Parties' relationship without the prior written consent of the other party and without the other party's prior written approval of the text of any press release or other public announcement.

16.     **Assignment.**  Licensee shall not assign, or encumber the rights granted to it hereunder without Licensor's prior written consent, which consent may be withheld in Licensor's discretion. Any assignment effected in violation of this provision shall be void ab initio and of no force or effect. Licensor may assign this Agreement to any successor by name change, reorganization, acquisition, or merger.

17.     **General Provisions.**

(a)     This Agreement cannot be amended, modified or changed in any way whatsoever, except by a written instrument duly executed by both parties hereto, and this Agreement supersedes all prior written or oral agreements, statements or representations.

(b)     Nothing herein will be construed to create a joint venture or partnership by or between Licensor and Licensee so as to make either party hereto an agent or partner of the other. Neither party will become liable or bound by any representation, act, omission or agreement of the other which is contrary to the provisions of this Agreement.

(c)    All notices hereunder will be in writing and sent by certified or registered mail (return receipt requested), telecopier or email (with written confirmation of complete delivery), or messenger (with receipt of delivery) to the addresses set forth below:

<u>To Licensor</u>
Source Interlink Media
President, Enterprises Division
831 S. Douglas Street
El Segundo, CA 90245

With a Copy to:
Source Interlink Companies, Inc.
VP, Corporate Counsel – Intellectual Property
831 S. Douglas Street
El Segundo, CA 90245

<u>To Licensee:</u>
SCSW, Inc.
3511 Silverside Road, Suite 105
Wilmington, DE 19810
Attn: John Bandimere, President

With a Copy to:
Forward Sports Marketing
330 South East Douglas Street, Suite 102
Lees Summit, Missouri 640063
Attn: Ryan Hass, Partner

Any such notice or approvals hereunder will be deemed received (a) upon the date three (3) business days after mailing certified or registered mail, return receipt requested, or on the second business day after sending by overnight carrier; or (b) if sent by facsimile or email, will be deemed delivered when sent provided that written confirmation of delivery is received by the sender. Each party may designate in writing such other place or places that notices may be given hereunder

(d)    This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware without regard to the principles of conflicts of law. In the event of any dispute or litigation arising out of or related to this Agreement, such dispute shall be brought in the state or federal courts in or for Wilmington, Delaware , and such courts shall be the exclusive venue for any dispute or litigation arising out of or related to this Agreement. In the event of any action, suit or proceeding arising out of or related to this Agreement, the prevailing party in such litigation shall be entitled to recover its costs and expenses, including, without limitation, reasonable outside attorneys' fees, incurred in connection with such litigation.

(e)    In the event that any provision in this Agreement is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement.

(f)    The failure by either party, at any time, to require performance by the other party of any of the provisions hereof will not be deemed a waiver of any kind nor will it in any way affect the waiving party's rights thereafter to enforce the same.

(g)    Section headings and captions, as used in this Agreement, are for convenience only and are not a part hereof, and will not be used to interpret any provision of this Agreement.

(h)    The terms of this Agreement and the words used herein will be deemed to be the language chosen by the parties hereto to express their mutual intent. Therefore, this Agreement will be construed without regard to any presumption or rule requiring construction against the party causing the Agreement or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under this Agreement.

(i)    This Agreement, together with any exhibits and schedules, is entire and complete, and no representations, warranties, agreements or covenants, express or implied, of any kind or character whatsoever have been made by either party to the other except as expressly set forth in this Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.

(j)    Force Majeure. In the event that either party is unable to perform its obligations, pursuant to this Agreement due to any fire, casualty, lockout, riot, war, act of God, riot, labor strike, insurrection, natural catastrophe, or the exercise of authority of either the federal or state government or any political subdivision thereof, or any event beyond either party's reasonable control ("Force Majeure Event") that renders either party's performance hereunder, in whole or in part, impossible, the deadlines for performance by both parties shall be extended by a period equal to the length of time during which such Force Majeure Event remains in effect.

(k)    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together will constitute one instrument. The Parties agree that copies of this Agreement (including copies of any signatures) that are reproduced or transmitted via portable document format (PDF) or electronically receipted fax transmissions will be equivalent to original documents. Notwithstanding the foregoing, at either party's option, the Parties will deliver to one another original executed versions of this Agreement as promptly as possible after such request is made.


**[SIGNATURES FOLLOW ON NEXT PAGE]**


15

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

SOURCE INTERLINK MAGAZINES, LLC

By: _____

Name: JACQUELINE BLUM

Title: SVP Bus. Dev / Pres Enterprise

Date: 11/4/09

SCSW, Inc.

By: _____

Name: Billy Meyer

Title: Sr / Treas

Date: 11-4-09

16

EXHIBIT A - - FORM OF ANNUAL STATEMENT

**Venue(s)**

Licensee Name:   SCSW, Inc.

Phone No:

Fax No:                                    Event Date:

<u>NOTE TO LICENSEE:</u>  YOU MUST INDICATE THE NAME OF EACH RETAIL
OUTLET BROKEN DOWN BY SKU #.

| Product/ Revenue | Units sold | Unit Price by Item | Gross Sales | Actual Returns Dollars | Gross Sales | | |
|---|---|---|---|---|---|---|---|
| Spectator | | | | | | | |
| Car Show | | | | | | | |
| Racer | | | | | | | |
| Swap Meet | | | | | | | |
| Vendor | | | | | | | |
| Apparel | | | | | | | |
| Sponsorsh ip-Local | | | | | | | |
| Sponsorsh ip- National | | | | | | | |

Prepared by:_____

17

**EXHIBIT B - - LICENSEE LINE LIST**

**LINE LIST for Licensed Merchandise Vendor**

Licensee shall provide a completed Line List to SIM (set forth below) of each item in development on a quarterly basis, or upon request by SIM, and shall be sent directly to **Source Interlink Media™, Inc. – Enterprises Division, 6420 Wilshire Boulevard, Los Angeles, California 90048, Attention: Creative Director.**

Licensee shall include a photograph of each item or concept in the "Item Photo" column, when available.

**Licensee:** _____
**Contact:** _____
**Phone:** _____
**Date:** _____

| Item Photo | Item Description | Item Number | Wholesale | SRP | Retail Channel | Sample Date | Ship Date | In Store Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

18

# EXHIBIT C

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Hope Andrade
Secretary of State

## Office of the Secretary of State

## CERTIFICATE OF TRADEMARK OR SERVICE MARK REGISTRATION
## OF

Super Chevy.com Show

Registration Number: 801468282

The undersigned, as Secretary of State of Texas, by virtue of the authority vested in the Secretary by Chapter 16, Texas Business and Commerce Code hereby issues this Certificate of Trademark or Service Mark Registration and attaches hereto a copy of the application for registration. Such registration is issued in connection with the class code described below for a term of ten years from the date of registration of application shown below.

Class Code: Education & Entertainment: Class 41
Dated: 2/3/2012

Hope Andrade
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: Dianne Gattuso          TID: 10273          Document: 384777990006

# EXHIBIT C-1

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Hope Andrade
Secretary of State

## Office of the Secretary of State

### CERTIFICATE OF TRADEMARK OR SERVICE MARK REGISTRATION OF

Super Chevy Show PERFORMANCE Vehicles - Parts - Racing Car Show Drag Race
Swap Meet Autocross Series Presented By & Design

Registration Number: 801468277

The undersigned, as Secretary of State of Texas, by, virtue of the authority vested in the Secretary by Chapter 16, Texas Business and Commerce Code hereby issues this Certificate of Trademark or Service Mark Registration and attaches hereto a copy of the application for registration. Such registration is issued in connection with the class code described below for a term of ten years from the date of registration of application shown below.

Class Code: Education & Entertainment: Class 41
Dated: 2/8/2012

Hope Andrade
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555         Fax: (512) 463-5709         Dial: 7-1-1 for Relay Services
Prepared by: Dianne Gattuso         TID: 10273         Document: 384777780006

# EXHIBIT D

# SHEEHY, LOVELACE & MAYFIELD, P. C.
### ATTORNEYS AND COUNSELORS AT LAW
*Established 1893*

JOHN F. SHEEHY, JR.
PHILIP E. McCLEERY
GARY K. JORDAN
O. MAYNARD GREEN
PETER K. RUSEK
JEFFREY R. COX
JOHN O'HERREN
MICHAEL J. GULIG
STEVEN M. BURTON
CHRISTIAN J. HACK
DAVID M. MATHEWS
E. ALAN BENNETT
PATRICK BRADY

510 NORTH VALLEY MILLS DRIVE, SUITE 500
WACO, TEXAS 76710

TELEPHONE:   (254) 772-8022
FACSIMILE:   (254) 772-9297

FIRM WEBSITE: www.slmpc.com
DIRECT EMAIL: chack@slmpc.com

JOHN F. SHEEHY
(1898-1979)

J. HENRY LOVELACE
(1926-1992)

DAN E. MAYFIELD
(1934-2012)

October 2, 2014

***VIA OVERNIGHT DELIVERY AND EMAIL***
Mr. Tyler Schulze, Senior Vice President
The Enthusiast Network
  f/k/a Source Interlink Media, LLC
1733 Alton Parkway, Ste. 100
Irvine, CA 92606

***VIA OVERNIGHT DELIVERY AND EMAIL***
Mr. Ed Zinke, Associate General Manager Muscle Car Group
The Enthusiast Network
  f/k/a Source Interlink Media, LLC
1733 Alton Parkway, Ste. 100
Irvine, CA 92606

      RE:    **Notice of Material Breaches of License Agreement and
               Material Change in Services Rendered**

<u>**NOTICE OF TERMINATION OF LICENSE AGREEMENT**</u>

Gentlemen:

Please be advised that the undersigned law firm represents SCSW, LLC ("SCSW"). This letter is being sent to notify you that "you", The Enthusiast Network (*formerly known as* Source Interlink Media, LLC)("Licensor"), have been, and remain, in default of the License Agreement (as defined below), for failing to provide the services agreed to, and contracted for, under the License Agreement between SCSW and Licensor dated November 4, 2009, and as amended by Amendment No. 1 to License Agreement, dated November 30, 2010, Amendment No. 2 to License Agreement dated, December 2, 2011, Amendment No. 3 to License Agreement, dated November 29, 2012 and Amendment No. 4 to License Agreement, dated November 12, 2013, (the License Agreement and Amendments may collectively be referred to as the "License Agreement"). Any capitalized terms not defined in this letter shall have the meaning set forth in the License Agreement.

Licensor is in default of the License Agreement for Licensor's failure to comply with Section 5(a)(i) of the License Agreement, which states:

> With respect to each Licensed Event conducted (excluding cancellations and rain-outs) by Licensee, Licensor **shall provide** 1 full page advertisement (full color) and 1 page of editorial coverage in the Magazine. (Emphasis added.)

Specifically, Licensor failed to run the advertisement or editorial coverage for the Super Chevy Show event held at Virginia Motorsports Park, Petersburg, Virginia (the "Virginia Event") in its May 2014 Super Chevy Show magazine issue as required by the License Agreement (which issue was to go on sale march 14, 2014). Virginia Motorsports Park provided Licensor with the information required to run the advertisement, which information was provided via email to Patricia Ludi, the Ad Operations Coordinator of Licensor. Ms. Ludi acknowledged receipt of the information on or about January 24, 2014. (We have attached a copy of the email for your convenience.) Licensor's failure to fulfil its duties and obligations under the License Agreement is a material breach of the agreement, which damaged the Virginia Event and the Super Chevy Show brand and for which SCSW has paid Licensor. While the terms of the License Agreement provide that Licensor be given the opportunity to cure defaults, as the Super Chevy Show event that Licensor was contractually obligated to advertise and support has passed, there is no way to cure the incontrovertible default by Licensor.

Additionally, you have allowed the Licensed Event to become devalued by your refusal to protect the intellectual property that our client is paying you for under the License Agreement. In particular, US 13 Dragway in Delaware has, during the course of the License Agreement, openly promoted its own "Super Chevy Show." You failed to defend the intellectual property you license to our client for a fee, and in fact, SCSW was forced to seek its own legal remedy to protect the Super Chevy Show brand from US 13 Dragway's infringing event. If you were collecting fees from US 13 Dragway for their event, then you were clearly violating the License Agreement. If you were simply ignoring the violation and infringement of the intellectual property that is the Super Chevy Show, then you were derelict, at best, in the duty you owed our client. More generally, you have devalued the brand by helping to promote events that compete directly with the Licensed Event.

Finally, as we understand, Source Interlink, due to financial difficulties, was forced to change entities/identities so that it could continue to operate, at some lower level of distribution. With the change in identity came a very apparent change in the nature of Licensor's business and business practices, (specifically including, but not limited to, the number of copies of the promotion materials and magazines currently being distributed, as well as a noticeable shrinking in the number of its distribution outlets). This material change has affected the way in which Licensor has acted, or rather has failed to act in promoting the Licensed Events under the License Agreement. This change is a material change to the contract entered into between SCSW and Licensor. This change was unilaterally made by Licensor without the consent of SCSW and to the detriment of SCSW.

For these reasons, among others, this letter is being sent to notify you that SCSW is terminating the License Agreement, including all Amendments thereto for Licensor's breach of said agreement.

---

With that being said, SCSW is willing to entertain any offers by Licensor for SCSW to purchase the Licensed Event and any proven ownership of the Super Chevy Show brand from Licensor. If you are interested, please send us a term sheet, which we will discuss with our client.

Please feel free to contact us if you have questions.

Sincerely,

SHEEHY, LOVELACE & MAYFIELD, P.C.

Peter K. Rusek
Christian J. Hack

LICENSE TERMINATION NOTICE LETTER

**From:** "Ludi, Patricia" <Patricia.Ludi@sorc.com>
**Subject: RE: super chevy ad scaled**
**Date:** January 24, 2014 10:56:12 AM EST
**To:** stephen kelley <skelley@vmpdrag.com>

Thank you so much.

Patty Ludi
Ad Operations Coordinator - Street Rodder, Rod & Custom, Popular Hot Rodding, Chevy High Performance,
Super Chevy, Camaro Performers, Classic Trucks, Custom Classic Trucks, Engine Masters, GM High Tech,
Muscle Car Review
Source Interlink Media
1733 Alton Parkway
Irvine, Ca 92606
949-705-3337
Patricia.Ludi@sorc.com

-----Original Message-----

1

From: stephen kelley [mailto:skelley@vmpdrag.com]
Sent: Thursday, January 23, 2014 1:27 PM
To: Lydi, Patricia
Cc: bryanp@virginiamotorsports.com
Subject: super chevy ad scaled

Hi Patt,

Here is the Chevy Ad, this should fit in the guide lines. Please let me know if you have any issues.

Thanks

2

# EXHIBIT E

# SHEEHY, LOVELACE & MAYFIELD, P. C.

### ATTORNEYS AND COUNSELORS AT LAW
*Established 1893*

JOHN F. SHEEHY, JR.
HENRY W. FIELDER
PHILIP E. McCLEERY
GARY K. JORDAN
G. MAYNARD GREEN
PETER K. RUSEK
JEFFREY R. COX
JOHN C. HERREN
MICHAEL J. GULIO
STEVEN M. BURTON
CHRISTIAN J. HACK
DAVID M. MATHEWS
STEPHEN S. GARNER

510 NORTH VALLEY MILLS DRIVE, SUITE 500
WACO, TEXAS 76710

TELEPHONE:   (254) 772-8022
FACSIMILE:   (254) 772-9297

FIRM WEBSITE: www.slmpc.com
DIRECT EMAIL: chack@slmpc.com

JOHN F. SHEEHY
(1898-1979)

J. HENRY LOVELACE
(1926-1992)

DAN E. MAYFIELD
(Of Counsel)

September 4, 2012

US 13 Dragway
34590 Sussex Highway
Laurel Delaware 19956

*VIA FAX 302-875-9083*

RE:     **Demand on US 13 Dragway to Cease-and-Desist**

Dear Sir or Madam:

Please be advised that the undersigned law firm represents SCSW, LLC. It has come our client's attention that your track is, and has been, advertising an event identified as Super Chevy Show. *See generally:*

> *http://delawareracing.com/DragStrip/schedule/* ;
> *http://delawareracing.com/DragStrip/*

Please be advised that "Super Chevy Show" is duly recorded and protected intellectual property (the "*Property*") under the laws of the United State of America. SCSW, LLC has a contract with the owner of the Property, under which License Agreement SCSW, LLC has been granted a license to promote, manage and operate Super Chevy Show. Your use of the name/mark Super Chevy Show is a violation of both federal law and my client's License Agreement.

Your use of Super Chevy Show is misleading and likely to cause the type of confusion that trademark and copyright laws of the United States are specifically meant to deter. The fact is that your unlicensed event has the same name and characteristics of that licensed by our client; specifically, the actual "goods and services" being promoted and sold at your Chevrolet event are the same as those under the License Agreement, or so similar as to be indistinguishable. Our client has invested a significant amount of money to advertise and promote the Super Chevy Show (which as you are aware is a multi-state, multi-track event), which promotion you are benefitting from without authorization or remuneration, or so much as an acknowledgement.

Cease and Desist
K:\CASES\CJH Misc\Corp\SCSW\Cease-Desist1.doc

Accordingly, you are hereby directed to cease-and-desist from advertising any Super Chevy Show at your track.  You have until Friday, September 7, 2012, to remove all references to Super Chevy Show from your website or any other advertising materials you are currently using, and to refrain from using Super Chevy Show in the future.  Moreover, we request that you update your website to include a clarification that the event you are/were advertising is not a Super Chevy Show by the same date.

If you cannot, or will not do so, our client shall consider additional legal action, which may include, but not be limited to the filing of a lawsuit against you seeking injunctive relief and a financial award for damages, including attorneys' fees and costs of court.

Please feel free to contact me if you have questions.

Sincerely,

SHEEHY, LOVELACE & MAYFIELD, P.C.

Christian J. Hack

Cease and Desist
K:\CASES\CJH Misc\Corp\SCSW\Cease-Desist1.doc

**Christian Hack**

| | |
|---|---|
| **From:** | US 13 Dragway <delawareracing@comcast.net> |
| **Sent:** | Tuesday, September 04, 2012 3:14 PM |
| **To:** | Christian Hack |
| **Subject:** | Super Chevy Info |
| **Attachments:** | Sheehy, Lovelace & Mayfield, P.C. Letter.docx |

Christian,
Attached is the letter per our phone conversation.

Thanks
Charles Cathell
*US 13 Dragway, Inc.*

Sheehy, Lovelace & Mayfield, P.C.


Attn: Christian J. Hack

Per our phone conversation, the US 13 Dragway has for over thirty years used the name Super Chevy Show Shine & Drags for our annual anniversary show.  I would like to continue to use this name, however if they feel that this name is an infringement please let me know. I will have the web page up dated with the change.  Please feel free to contact me with any questions or comments.

Sincerely,

Charles Chathell

410-726-8073

# SHEEHY, LOVELACE & MAYFIELD, P. C.
### ATTORNEYS AND COUNSELORS AT LAW
*Established 1895*

JOHN F. SHEEHY, JR.
HENRY W. FIELDER
PHILIP E. McCLEERY
GARY R. JORDAN
G. MAYNARD GREEN
PETER E. BERGE
JEFFREY R. COX
JOHN G. HEFREN
MICHAEL J. CULIO
STEVEN M. BUXTON
CHRISTIAN J. KACK
DAVID M. MATTHEWS
STEPHEN J. GIANNA

510 NORTH VALLEY MILLS DRIVE, SUITE 500
WACO, TEXAS 76710

TELEPHONE:  (254) 772-8022
FACSIMILE:  (254) 772-9297

FIRM WEBSITE www.slmpc.com
DIRECT EMAIL: chack@slmpc.com

JOHN F. SHEEHY
(1931-1979)

J. HENRY LOVELACE
(1916-1992)

DAN E. MAYFIELD
(Of Counsel)

September 5, 2012

US 13 Dragway
Mr. Charles Chathell
34590 Sussex Highway
Laurel Delaware 19956

*VIA FAX 302-875-9083 and*
*VIA EMAIL delawareracing@comcast.com*

RE:  Agreement to Cease-and-Desist between US 13 Dragway and
SCSW, LLC, regarding use of "Super Chevy Show"

Dear Charles:

Thank you for your quick response to my letter of September 4, 2012, regarding the "Super Chevy Show" (or the *"Property"*). I have reviewed the information you provided and I have discussed it with my client. My client has asked me to contact you and enter into certain agreements with you regarding the Property at issue in this case. As such, the purpose of this letter is two-fold:

1. To set forth the general terms of our conversation of Tuesday, September 4, 2012, regarding the demand for US 13 Dragway to cease-and-desist from using the name "Super Chevy Show"; and
2. To memorialize an agreement between US 13 Dragway and SCSW, LLC regarding "Super Chevy Show", my client's Property.

In my letter dated September 4, 2012, I advised you that you are currently advertising an event identified on the internet (and in certain other advertising mediums) as "Super Chevy Show", which name is protected intellectual property duly licensed to my client. As my letter set forth, your event, both in name and the substance of the event itself, are sufficiently similar to my client's Super Chevy Show, to cause confusion among the general public, and especially those individuals who frequent drag racing events. It is my understanding from our phone conversation that you are willing to take reasonable, and quick, action to ensure that this matter is resolved amicably. Accordingly, my client

Agreement of the Parties re: "Super Chevy Show"
K:\USERS\JP\ McC\scsw\SCSW\Indexical Agreement.doc

09/06/2012  09:24    3028759083           DELAWARE MOTORSPORTS           PAGE  03/03
09/05/2012  16:00 Sheehy, Lovelace and Mayfield          (FAX)2547729267          P,003/003

has requested that you agree to, and take the following action to remedy the current infringement of the licensed property, Super Chevy Show, by US 13 Dragway.

1. US 13 Dragway acknowledges that "Super Chevy Show" is duly recorded intellectual property, licensed, under contract, to SCSW, LLC.
2. US 13 Dragway will remove the word "Super" from the title of the event currently scheduled for September 9, 2012, (as a result of a rain delay), from all internet advertisings (and from all other advertising as can reasonably be accomplished before September 9, 2012);
3. US 13 Dragway will add the following language to its website to clarify and distinguish its event from my client's Super Chevy Show:

> THE US 13 DRAGWAY EVENT SCHEDULED FOR SEPTEMBER 9, 2012, IS NOT PART OF THE NATIONAL 12 EVENT DRAG RACE, CAR SHOW AND MARKET KNOWN AND NATIONALLY ADVERSTISED AS THE SUPER CHEVY SHOW, WHICH IS OWNED, OPERATED AND MANAGED BY SCSW, LLC.

4. US 13 Dragway will not print any additional advertising for Super Chevy Show for the September 9, 2012 event, which includes the word "Super" in the title.
5. US 13 Dragway agrees that it will not, in the future, identify or otherwise advertise or market any event as Super Chevy Show, unless authorized to do so, in writing, by SCSW, LLC.
6. US 13 Dragway understands, agrees and acknowledges that the terms of this agreement are effective as of September 5, 2012.

In exchange, SCSW, LLC, agrees that it will refrain from taking any legal action it may be entitled to, and will continue to refrain from doing so, as long as, US 13 Dragway refrains from using "Super Chevy Show" to identify any future racing events.

US 13 Dragway acknowledges its agreement to the terms set forth above by the signature of its duly authorized representative below.

Please feel free to contact me if you have questions.

Sincerely,

SHEEHY, LOVELACE & MAYFIELD, P.C.

Christian O. Hack

AGREED AND ACKNOWLEDGED:
US 13 DRAGWWAY

By: _____
CHARLES CHATHELL,

Agreement of the Parties re: "Super Chevy Show"
K:\CLIENTS\TR Mkt\Corp\SCSW\Settlement Agreement.doc

# EXHIBIT F



DIANA R. MALHIS, ESQ.
CORPORATE COUNSEL
831 SOUTH DOUGLAS STREET
EL SEGUNDO, CA 90245
TELEPHONE: 310.531.9953
E-MAIL: DMALHIS@ENTHUSIASTNETWORK.COM

February 10, 2015

*Via Certified Mail*

Texas Motorplex
7500 Hwy 287
Ennis, TX 75119
Attention: Billy Meyer

RE:    Use of SUPER CHEVY Mark at Tracks

Dear Mr. Meyer:

As discussed in earlier conversations with our executives representing our company, we have made many changes over the past year and have been reinvesting in our media brands both for our customers and our consumers. We have made great strides and are well positioned to be a great partner moving forward. We remain very interested in re-establishing a more powerful relationship in which we can mutually benefit and learn from any challenges of the past. Accordingly, we stand by ready to engage in partnership discussions related to SUPER CHEVY or any other ideas and opportunities that we may consider together.

However, in the event you are not interested in continuing such a dialogue, we want to ensure you fully understand our position as it relates to our intellectual property ownership of the SUPER CHEVY brand. Make no mistake TEN: The Enthusiast Network Magazines, LLC ("TEN") has invested substantial resources in advertising and promoting its goods and events under the SUPER CHEVY mark for over 40 years and has acquired substantial goodwill as a result of its extensive use of such mark. Due to TEN's widespread and prolonged use of the SUPER CHEVY mark, consumers in the automotive enthusiast communities have come to associate and recognize the SUPER CHEVY mark as belonging to TEN.

We understand that above-mentioned track (the "Track") has been promoting events taking place at its location under the SUPER CHEVY mark on social media channels, websites, signage, brochures, print and digital advertising as well as marketing materials (collectively, the "Commercial Materials"). Given the widespread recognition of the SUPER CHEVY mark in the automotive enthusiast communities, the Track's continued use of the SUPER CHEVY mark on its Commercial Materials likely will cause consumer confusion by leading consumers to conclude that the Commercial Materials are associated with, owned by, or sponsored by TEN.

Accordingly, should the Track decline TEN's invitation to engage in meaningful partnership discussions as noted above, TEN hereby demands that the Track cease and desist from using the SUPER CHEVY

mark in any capacity within seven (7) calendar days following the date of this letter. If the Track fails to comply with the foregoing demands on a timely basis, TEN will regard any further use of the SUPER CHEVY mark as an act of willful trademark infringement. No statement contained in this letter shall be construed as waiving or otherwise prejudicing TEN's right to seek an appropriate remedy in court in the event that this matter is not amicably resolved.

Please contact the undersigned to confirm the Track's timely compliance with the foregoing demands.

Sincerely,

Diana R. Malhis, Esq.

cc:     Scott Dickey, TEN, Chief Executive Officer
        Peter Englehart, TEN, Chairman of the Board
        Ryan Haas, Forward Sports Marketing

# EXHIBIT G

**MASTERS ENTERTAINMENT GROUP**

907 Highway 126
Bristol, TN 37620

(423) 968-7736 (office)
(423) 989-3651 (fax)

15-1002-R2 (RM)

## 2015 - AGREEMENT

This AGREEMENT is made and entered into in Nashville, Tennessee, this 16th day of October, 2014, by and between MASTERS ENTERTAINMENT GROUP, INC., a Tennessee based Corporation, hereinafter known as (MEG), and SCSW LLC (for its MANUFACTURERS CHEVY SERIES) of Waco, TX, hereinafter known as (CLIENT).

MEG guarantees to deliver benefits as follows:

1)   CLIENT will receive thirteen (13) Stand Alone episodes (22:15 minutes in length) with one (1) original airing of each episode on the Velocity Network, with each airing scheduled for a consistent Saturday 9:00am EST time slot in the 4th quarter of the 2015 season.  "Manufacturers Chevy Series" will be produced at the following events in 2015 (each of the twelve (12) dates will be for one day coverage and production):

| EVENT SITE | DATE |
|---|---|
| Jupiter, FL | Saturday, March 28, 2015 |
| Memphis, TN | Saturday, April 11, 2015 |
| Tucson, AZ | Saturday, May 2, 2015 |
| Dallas (Ennis), TX | Saturday, May 16, 2015 |
| Petersburg, VA | Saturday, May 16, 2015 |
| Martin, MI | Saturday, May 30, 2015 |
| Reading, PA | Saturday, July 18, 2015 |
| Denver, CO | Saturday, August 15, 2015 |
| Bristol, TN | Saturday, September 26, 2015  19 ,2015  — *Ron Rogers* |
| St. Louis, MO | Saturday, October 10, 2015  *12-8-14* |
| Rockingham, NC | Saturday, October 10, 2015  *(RM)* |
| Bakersfield, CA. | Saturday, November 7, 2015 |

If any of the above event dates change, CLIENT will be required to advise MEG 60-days prior to the scheduled event in writing for logistics and planning.

Both parties agree that the thirteenth (13th) episode of the thirteen (13) week "Manufacturers Chevy Series" will be a "Best of Season" show.

2)   CLIENT will receive a total of thirteen (13) Sponsor Features (one (1) to one and one-half (1-1/2) minutes in length) to be produced from the twelve (12) Manufacturers Chevy Series events highlighting the products and involvement of a sponsor designated by CLIENT. (Therefore at one (1) event two (2) Sponsor Features will be produced)

3)   CLIENT will have the opportunity to pay for an additional full day (10 hours) of videotaping for $2,000.00.

4)   CLIENT will receive Television Entitlement Rights to a thirteen (13) week series entitled "Manufacturers Chevy Series".

12/08/2014   03:04   4239093651                    MASTERS ENTERTAINMEN                    PAGE  03/86

MEG____ CLIENT ____

15-1002-R2 (BM)
Manufacturers Chevy Series
2015 Standalone Series, Entitlement Rights, Series Features
Page two of five

5)     CLIENT will receive On-Screen Graphics of their company logos on the Title Page of each episode.

6)     CLIENT will receive audio In-Bumps and Out-Bumps as part of the thirteen (13) week series.

7)     CLIENT will receive On-Air Mentions by host and on-site talent.

8)     Clear in-focus signage opportunities may be created throughout the production of the series feature by the CLIENT (must meet Network production guidelines and standards).

9)     CLIENT will receive an HD link of each episode after the scheduled air date of the program.

10)    CLIENT has the right to provide, at its expense, its own on-air talent to host each show.  On-air talent must meet network approval.

11)    MEG shall furnish all videotaping equipment, with a minimum of one (1) HD camera, camera "sungun" light, and personnel required to videotape each event.

12)    CLIENT and MEG will agree upon times to videotape each day, with MEG's recommendation that the 10-hour time period most likely be from 10:00am – 8:00pm.

13)    CLIENT will receive the right to and submit HD in-car and HD aerial drone footage for MEG's use in the production of each show.

14)    Content of each show will primarily focus on the car show, and will also include CLIENT sponsored segments for auction, awards ceremonies, unique car stories, Best of the Best, host track facilities, swap meet and minimal racing.

15)    MEG shall furnish audio recording equipment including lavaliere and hand-held mics to adequately record the audio of interviews at each event.

16)    CLIENT will provide a liaison at each event to communicate with MEG in advance and during the event to outline priorities to be videotaped so that all parties will be pleased with the production outcome.

17)    MEG shall edit and produce each episode and deliver to network based on all requirements set forth by network.

       CLIENT agrees to pay MEG the amount of.........$152,700.00 NET

       Payment schedule shall be as follows:

| | |
|---|---|
| $12,725.00 – Due January 28, 2015 | $12,725.00 – Due May 18, 2014 |
| $12,725.00 – Due February 11, 2015 | $12,725.00 – Due June 14, 2015 |
| $12,725.00 – Due March 2, 2015 | $12,725.00 – Due July 26, 2015 |
| $12,725.00 – Due March 16, 2015 | $12,725.00 – Due August 10, 2015 |
| $12,725.00 – Due March 16, 2015 | $12,725.00 – Due August 10, 2015 |
| $12,725.00 – Due March 30, 2015 | $12,725.00 – Due September 7, 2015 |

If CLIENT does not make all payments as listed herein in a timely manner (Net 30 Days) MEG may declare the AGREEMENT null and void and MEG will retain all payments made as damages.

12/08/2014  03:04   4239893651          MASTERS ENTERTAINMEN          PAGE  04/06

MEG____ CLIENT ____

15-1002-R2 (BM)
Manufacturers Chevy Series
2015 Standalone Series, Entitlement Rights, Series Features
Page three of five

WARRANTIES
    Both parties signing this AGREEMENT represent and warrant that they have the full right and legal authority to grant the rights granted herein and perform its obligations hereunder.

MEG "Cancellation Policy" (if applicable): If the event is declared "cancelled" the production company will make every effort to videotape a sufficient number of features, to produce the program from the event site without the event being completed.  MEG will ensure that results are graphically indicated as part of the program when completed and supplied by CLIENT, at the conclusion of the event.  If a sufficient number of features cannot be videotaped to produce the program, because of cancellation, MEG will return on a rescheduled date, provided CLIENT agrees to pay an additional expense fee of $5,000.00 NET per event.  If the event is cancelled and CLIENT does not pay the reschedule fee, CLIENT will forfeit a deposit of $9,000.00, which shall be used to cover MEG expenses and airtime costs, and the network will repeat a previously aired program.

OVERTIME (Full Event Coverage):
    If production of the "Manufacturers Chevy Series" event exceeds a maximum of ten (10) hours per day, CLIENT agrees to pay MEG an additional fee of $500.00 per hour for overtime.  No overtime fees will be charged without a discussion and written approval from the track liaison at any event.

LIGHTING (Full Event Coverage):
    If production of the event continues past daylight hours, or is scheduled as a night production, CLIENT agrees to ensure adequate lighting for network television production.

    MEG, at its sole expense, shall obtain and keep in force during the term of this Agreement the following minimum amount of insurance coverage that shall be primary and non-contributory with any coverage of CLIENT: $1,000,000.00 Commercial General Liability insurance, per occurrence,  with coverage for products and completed operations liability, contractual liability, and property damage.

    CLIENT AGREES TO INCLUDE MEG, and the Velocity Network as a named insured on its liability insurance policy, and CLIENT agrees to hold MEG, and the Velocity Network, its officers and employees harmless from any third party lawsuits arising from any incidents that may occur at said events, including, but not limited to, any intentional or unintentional torts committed by either MEG, or the Velocity Network.

    MEG shall be solely responsible for ensuring compliance with all federal, state and local laws, ordinances, rules, regulations, orders, standards, and requirements, now or hereafter applicable, to its activities and obligations under the Agreement and the Service performance.

    MEG shall be an independent contractor under this Agreement and shall assume all of the rights, obligations, and liabilities applicable to it as an independent contractor.  Nothing set forth herein shall make CLIENT and MEG joint venturers or partners, or make MEG an agent of CLIENT, or make CLIENT liable for debts and obligations of MEG.  MEG shall be solely responsible for the hiring, discharge, supervision, training, and discipline of its own employees and personnel.  CLIENT retains the right, in its sole discretion, to remove from service without any notice, any of MEG's employees, personnel, subcontractors, or sub-vendors that CLIENT deems unsuitable for the Service but shall not be required to provide a reason for such removal.  No officer, employee, agent, servant, or subcontractor of MEG shall at any time be deemed to be an officer, employee, or servant of CLIENT for any purposes whatsoever.

MEG ____ CLIENT ____

15-1002-B2 (BM)
Manufacturers Chevy Series
2015 Standalone Series, Entitlement Rights, Series Features
Page four of five

WHEREAS, CLIENT agrees that Velocity/MEG are not responsible if a program is not aired because of mechanical, electrical, other unforeseen problems or is not aired because of an Act of God. If the program is moved from its scheduled air date/time slot for any reason Velocity will air a "Make Good" of the same show in a similar time slot. If the program cannot be rescheduled, MEG will adjust the program sponsorship fee on a pro rata basis.

CLIENT agrees to obtain a "Photo Rights Release" from each participant featured on said television program, therefore, grants exclusive television rights to MEG.

Both parties fully understand that this AGREEMENT is subject to approval and acceptance of the Velocity Network prior to the first payment from CLIENT. MEG shall retain exclusive video rights to said series, including network television, Internet, and home video, and hereby assigns internal marketing rights for making copies of the program content, website, trade show promotions, training, recruitment and social medias to CLIENT. CLIENT shall have no rights to distribute program content for pay. All copies and all uses of the program content must include MEG's copyright and retain MEG's formatting and presentation. All video footage is copyright MEG. Furthermore if MEG sells the "Manufacturers Chevy Series" television programs to another network, CLIENT shall be entitled to 25% of the gross fee paid to MEG by network. CLIENT will have the right to purchase the rights to the series (thirteen (13) programs) at a total cost of $32,500.00.

If either party finds it is necessary to pursue legal means to enforce any rights under this AGREEMENT, the prevailing party to any dispute shall be entitled to reasonable expenses, attorney's fees and cost incurred in addition to any other relief to which it is entitled. In addition, any accounts thirty (30) days past due under the terms of this contract may be charged the lesser of a 1 and ½ percent per month late fee or the highest rate permitted by Tennessee law. This AGREEMENT, and any disputes or torts shall be judged in the State of Tennessee and under the laws of the State of Tennessee.

All rates quoted herein are non-commissionable.

MEG will maintain edit control for all feature and program content to ensure it meets network program production guidelines and standards.

This AGREEMENT shall be binding on the assigns and heirs to both parties.

This AGREEMENT cannot be cancelled unless mutually agreed upon, and set down in writing by both parties.

Both parties understand and agree not to disclose any of the items and conditions set forth in this Agreement or non-public information gained at the actual onsite events to any third party, including but not limited to producers, advertisers, promoters, sponsors, other racing series and other programming services.

This is the entire AGREEMENT between the parties and any amendments must be set down in writing and signed by both parties.

No party shall challenge the validity of a signed faxed or electronic signature on the basis of lack of an original signature.

MEG _____ CLIENT _____

15-1002-R2 (BM)
Manufacturers Chevy Series
2015 Standalone Series, Entitlement Rights, Series Features
Page five of five

    IN WITNESS THEREOF, the parties have executed this AGREEMENT, as of the day and year first written above.

MASTERS ENTERTAINMENT GROUP, INC. (MEG)

BY:

NAME: Butch McCall

TITLE:  Executive Vice President

DATE: October 16, 2014

SCSW LLC (MANUFACTURERS CHEVY SERIES) (CLIENT)

BY: _____

PRINTED NAME: _Billy Meyer_____

TITLE: _____SEC / TREAS_____

DATE: _____10-17-14_____

FEDERAL TAX ID #: _____

# EXHIBIT H

# GM General Motors Proposal Information Request
## (GM Confidential)

The following information is required for a detailed assessment of all proposals submitted to General Motors — additional information is welcome. If you need to add rows, place your cursor in the first cell of the last row of the table. MS Office 2007 Users: Remaining on the Home tab, click the down arrow on the Insert button and select Insert Sheet Rows. Lower versions of MS Office: Select Insert's Rows from the menu bar above.

Super Chevy Show series

SCSW LLC, 7919 Karl May Dr. Waco, TX 76708

Billy Meyer, Executive Board – Secretary/Treasurer, SCSW LLC, 7919 Karl May Dr. Waco, TX 76708,
(254) 644-9044 cell, (254) 751-1544 fax

$48,500 cash

100% due January 30, 2015

Presiding sponsor....is Super Chevy Show presented by Chevrolet Performance

**AUDIENCE INFORMATION/ATTENDANCE (Please list each event separately)**

| Events | | | | |
|---|---|---|---|---|
| | | | | |

**PRODUCT DISPLAY/USE**

**TICKETS/HOSPITALITY**

Form Revised 01/02/2011

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| | | | | |
| | | | | |

Additional PR Assets [illegible]

**MUST INDICATE BELOW** Whether Media is Promotional for Event/team OR Dedicated Solely to GM

NOTE: In all media submitted below, the QUANTITY column is to reflect a single specific number of ads/spots the [illegible] Promoter is committing, which will include GM [illegible]

**MEDIA - ADDED VALUE**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| No | Correct | | | Not by GM, but required by host tracks | Event advertising: TV, Radio, Internet, Newspaper, Direct Mail, E-Blast | 2 |
| | | | | | | |
| | | | | | | |

**MAGAZINE ADVERTISING - List of quantity for each ad size/color by title separately. NOTE - For any publication not in our database, we will require you to provide a copy of the publication's ratecard.**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**NEWSPAPER ADVERTISING - List quantity for each ad size/color, by newspaper, daily or Sunday separately. NOTE - For any publication not in our database, we will require you to provide a copy of the publication's ratecard.**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Local | Promotional - event advertisements | Home Market | $1,000-$5,000 | Full | Sports | Avg 4"x3" Column Inches | Same color, & same B&W | 2/week | 1/week | By Market | 2-weeks | -Position in title logo | 2 | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

**TV ADVERTISING - List quantity for each commercial length or daypart by station or network separately. List pre/post or in-game units separately. List pre/post or regular season units separately.**

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Local by track | Tracks run promotional event ads 2-weeks in advance of a show | Metro Area | Time Warner, Comcast, Charter | Open | Event ad | :30 seconds | Verbal & on-screen 10-seconds | Audio & Visual | By market 1-4/day | 2-weeks | 2 | |
| Velocity | Network will run tags promoting the OA broadcast using series logo with Chevrolet Performance recognition | Network | Network | Open | TV showed | :10 & :15 sec tags | Verbal & on-screen 5-seconds | Audio & Visual | Rotating 1-4/day | Oct-Dec | 2 | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

RADIO ADVERTISING - List quantity for each commercial length or daypart by station or network separately. List pre/post or in-game units separately. List pre/post or regular season units separately.

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|
| Local by track | Tracks run promotional event ads 2-weeks in advance of a show | Metro Area | Vary by market | Event ad | :60 seconds | Multiple, verbal :10 seconds | Avg 3/day | 2-weeks advance | 3 | |
| | | | | | | | | | | |
| | | | | | | | | | | |

INTERNET/WEB - List quantity for each ad size or type separately by website. (NOTE: NEW FORMAT)

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Overall Size of OM-dedicated Ad in Pixels? (xxx by xxx) pixels | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| www.supercheapyahoo.com | Dedicated | Homepage | Yes | 728x90 | | | | | | Yes | 100,000 impressions | Annual retailer | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Form Revised 10/26/2011